Filed 4/22/21  P. v. Moore CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LONNEL MOORE,<br><br>    Defendant and Appellant. | A159252<br><br>(Alameda County<br>Super. Ct. No. 18CR015986) |

Defendant Lonnel Moore appeals after a jury convicted him of human trafficking of a minor (Pen. Code,[1] § 236.1, subd. (c)), soliciting a child under the age of 16 to prostitute (§ 266h, subd. (b)), inducing a child to engage in a lewd act (§ 266j), and committing a lewd act upon a child (§ 288, subd. (c)(1)). His sole contention on appeal is that substantial evidence did not support the jury's special allegation finding that the trafficking involved force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury. (§ 236.1, subd. (c)(2).)  We affirm.

---

[1]      Further section references are to the Penal Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2018, 15-year-old K.D.[2] ran away from home. A person she knew sent defendant to pick her up. K.D. had never met defendant before and told him she was 19 years old. Defendant said he was 34 years old.

K.D. had worked as a prostitute prior to meeting defendant. They began living together in a motel room in Oakland, and K.D. continued engaging in prostitution and gave the money she earned to defendant.[3] K.D. always used condoms with customers but had unprotected sex with defendant. She loved defendant and believed they were in a relationship.

K.D. used various drugs with defendant, including cocaine, marijuana, and "ecstasy," the latter of which she started using for the first time with him. Defendant provided K.D. with ecstasy, and she it took "almost every day" and "was never really sober." The drug heightened her emotions, affected her perceptions, and kept her awake for prolonged periods.

During the time K.D. was with defendant, they fought often, and defendant would sometimes hit her and call her names, like " 'Bitch' " and " 'Stupid.' " She explained that most of the time when they fought and defendant hit her, they were high and she was numb and felt nothing, but

---

[2] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the victim by her first and last initials as indicated in the record and briefing.

[3] In a July 27, 2018, text message admitted into evidence, K.D. told defendant, " 'I really wanna be down wit you and run up a bag 4 you but at the same time I wish you would treat me different not just like any as hoe because really I'm not even a hoe I'm just a hustla because I can do hella shit besides hoe period I chose 2 hoe aint nobody force me so therefore lemme live my life and do other shit.' " Asked at trial by the defense if the statement " 'I choose to ho. Ain't nobody force me' " meant that K.D. was "choosing to prostitute" herself "[a]nd giving [defendant] the money," K.D. responded, "Yes."

after she sobered up, she felt pain from his blows. K.D. left defendant three times, and not knowing anyone in Oakland, went to other pimps in the area. However, she "always came back to [defendant]" and was never away from him for longer than a day or two.

On or about August 6, 2018, defendant kicked K.D. out of the motel room and told her "to go outside to work." Before leaving, K.D. took some ecstasy, which caused her to become delusional and paranoid, and she ended up spending the night on the streets. She eventually spoke with defendant on the phone and falsely claimed to have money but said he could not have it because she was done with him. A short time later, defendant showed up in a car where K.D. was walking. She had been hiding moments before defendant's arrival, but had been lured out of her hiding place by a telephone call from a woman who said she was there to pick K.D. up. Defendant quickly exited the vehicle and K.D. started to run, but defendant grabbed her arm and forced her into the vehicle. Defendant punched K.D. and angrily asked her where the money was.

Back at the motel room, defendant and K.D. argued, and defendant said, " 'I smell the money.' " He struck K.D. with a small metal bat on her legs and thighs and momentarily placed a pillow over her face so that she could not breathe. Fearing for her life, K.D. fought back and was able to escape.

K.D. called her mother, who called 911. K.D. eventually flagged down two police officers, one of whom noticed that her shirt was torn and her thigh bruised. K.D. told the officers, "The guy I was messing with[,] . . . he tried to kill me in the room. . . . [¶]. . . [¶]. . . He tried to kill me. Like this dude. He's a pimp, I was the hoe. . . . [¶]. . . [¶]. . . He just tried to, like . . . [¶]. . . [¶] kill me because I had no money." Defendant was eventually

3

arrested, and his cell phone was seized and its contents extracted and reviewed. On the date of his arrest, defendant was 36 years old.

Defendant was charged with human trafficking of a minor (§ 236.1, subd. (c); count one); soliciting a child under the age of 16 to prostitute (§ 266h, subd. (b); count two); inducing a child to engage in a lewd act (§ 266j; count three); kidnapping (§ 207, subd. (a); count four); and committing a lewd act upon a child (§ 288, subd. (c)(1); count five.) The information contained an enhancement allegation on count one that the trafficking involved the use of force, fear, deceit, violence, menace, or threat of unlawful injury. (§ 236.1, subd. (c)(2).)

At trial, Oakland Police Officer Martin Ziebarth of the department's vice and child exploitation unit testified as an expert on prostitution, pimping, and pandering. He opined that pimps typically discipline females working for them with tactics including beatings, forcing them to work in cold weather, and forcing them to work for long periods of time. A pimp will commonly use drugs like ecstasy to keep a female working for him.

Ziebarth further testified that pimps often use "psychological" techniques to control the females working for them, such as engaging in a sexual relationship, which causes them to feel that they are in love with their pimps and that any physical abuse is deserved. Ziebarth pointed to specific text messages between defendant and K.D. that were indicative of a sexual relationship. He also discussed the July 27 text message (see fn. 3, *ante*), stating, "In my opinion, [K.D.] is, she doesn't want to commit acts of prostitution anymore. She wants to be with [defendant], so there's a romantic attachment that she has to him. But she doesn't want to prostitute. And she's offering to do other things for him to earn money. Throughout all of the text messages, it was obvious that he was involved in selling marijuana

4

and pills. So she's offering to sell dope for him instead of prostituting. But she doesn't want to leave him."

According to Ziebarth, other text messages between defendant and K.D. showed she "didn't have a choice" when dealing with him. In one message, defendant wrote, "Bitch, either get dressed and get ready to go outside and get some money, or you could leave. I ain't got time for this BS." Ziebarth noted that K.D. had to ask permission "for pretty much everything" including buying a bag of chips. In a series of text messages sent early one morning, K.D. told defendant: " 'I'm not fitten to be out here all night.' " " 'Please at least come get me.' " " 'I'm not turning up no dates, so why keep me out here?' " " 'Where you at? Please, daddy. It's too cold.' "

The jury found defendant guilty on counts one, two, three, and five, and found the enhancement allegation on count one to be true. The trial court sentenced defendant to state prison for three years on count five plus 15 years to life on count one, and stayed the sentences on counts two and three.

Defendant appealed.

## DISCUSSION

When considering a challenge to the sufficiency of the evidence to support a conviction or a sentencing enhancement, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.) In making this determination, we do not reweigh the evidence or the credibility of witnesses. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162.) "Unless it is clearly shown that 'on no hypothesis

whatever is there sufficient substantial evidence to support the verdict' the conviction will not be reversed." (*Ibid.*)

Section 236.1 defines "coercion" to include "providing and facilitating the possession of a controlled substance to a person with the intent to impair the person's judgment." (§ 236.1, subd. (h)(1).) In determining whether there was coercion, courts "shall" consider "[t]he total circumstances, including the age of the victim" and "the relationship between the victim and the trafficker." (*Id.*, subd. (i).)

Viewing the record in the light most favorable to the judgment, a reasonable juror could have found beyond a reasonable doubt that defendant's trafficking of K.D. involved drug-induced coercion. K.D.'s testimony that defendant supplied ecstasy for her to take every day, leaving her "never really sober," and her descriptions of the effects of the drug (e.g., altered perception, prolonged wakefulness) supported an inference that defendant intended to impair her judgment and keep her performing sex work for long hours. A reasonable juror could also have credited Ziebarth's testimony that pimps commonly use drugs like ecstasy to control the females working for them to conclude that defendant engaged in similar conduct. Finally, the significant 20-year age gap between defendant and K.D. provided further support that the trafficking was coercive. Thus, we conclude there was substantial evidence of coercion. (§ 236.1, subds. (c)(2), (h)(1).)

We also conclude substantial evidence supported a finding of duress. Section 236.1 defines "duress" to include "a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed." (§ 236.1, subd. (h)(4).) As with coercion, in

6

determining duress, courts must consider the relationship and age gap between the trafficker and the victim. (*Id.*, subd. (i).)

Defendant contends substantial evidence of duress was lacking because his prior acts of violence towards K.D. were unrelated to her sex work and merely established that they had a combative relationship. We disagree. Viewing the evidence favorably to the judgment, a reasonable juror could have concluded that K.D. was under duress based on defendant's prior acts of violence against her, his controlling treatment (e.g., forcing K.D. to work all night in the cold, requiring her to ask permission for everything), and the 20-year age gap between them. That is, given the circumstances in which defendant had repeatedly hurt and controlled K.D., a reasonable person in her position would fear violence, hardship, or retribution from defendant if she did not continue to engage in prostitution and turn over her earnings. Indeed, K.D. was so fearful of defendant during the August 6 incident that she hid and then ran when she first saw him.

Defendant emphasizes K.D.'s testimony that she was a prostitute before meeting him, as well as her July 27 text message and related testimony that she chose to continue engaging in prostitution with him.[4] However, viewing the record in the light most favorable to the judgment, a reasonable juror could have disbelieved K.D.'s testimony on the voluntariness of her actions (CALCRIM no. 226 [jurors may believe some parts and disbelieve other parts of witness's testimony]) and instead credited Ziebarth's testimony that it is common for juveniles with pimps to "refer to them as a boyfriend and usually say, 'It was my decision. I made the choices.'"

---

[4] We note that consent by a minor is not a defense to criminal prosecution under section 236.1 (§ 236.1, subd. (e)), but we consider defendant's argument as it relates to the element of duress for purposes of the special allegation finding under section 236.1, subdivision (c)(2).

Ziebarth's testimony in this regard was bolstered by the evidence that defendant had manipulated K.D. into thinking they were in a romantic relationship. Furthermore, as Ziebarth observed, the July 27 text message suggested that K.D. no longer wanted their relationship to involve prostitution. The fact that it continued to do so, along with the evidence of defendant's violent and controlling behavior, provided substantial evidence for a reasonable juror to conclude beyond a reasonable doubt that defendant's trafficking of K.D. involved duress.

## DISPOSITION

The judgment is affirmed.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Petrou, J.


_____
Wiseman, J.*

---